# STATE OF CONNECTICUT *v.* MICHAEL JEFFREYS
## (AC 21542)

Dranginis, Flynn and West, Js.

Argued March 25—officially released August 12, 2003

*Kent Drager*, senior assistant public defender, with whom were *Jessica Grossarth* and *Elisa Heffernan*, certified legal interns, for the appellant (defendant).

*Judith Rossi*, executive assistant state's attorney, with whom, on the brief, was *Jonathan C. Benedict*, state's attorney, and *Joseph J. Harry*, senior assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Michael Jeffreys, appeals from the judgment of conviction, rendered following a jury trial, of possession of narcotics in violation of General Statutes § 21a-279 (a), possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a) and possession of narcotics with intent to sell within 1500 feet of a public housing project in violation of General Statutes § 21a-278a (b). The defendant claims that (1) the trial court improperly denied his motion to suppress evidence, (2) the court improperly denied his

motion for a speedy trial and his motion to dismiss on speedy trial grounds, (3) there was insufficient evidence that he possessed narcotics with the intent to sell, (4) there was insufficient evidence that he was within 1500 feet of a public housing project, and (5) his rights against double jeopardy were violated when he was convicted and sentenced separately for possession of narcotics and possession of narcotics with intent to sell.[1] We reverse in part and affirm in part the judgment of the trial court.

The jury could have found the following facts. On the morning of August 19, 1999, a tactical narcotics team of the Bridgeport police department was conducting a drug surveillance operation in the vicinity of Trumbull Gardens, a public housing project.[2] Two members of that tactical team, Officers Gregory Iamartino and Luis Batista, were conducting surveillance from the upper floor of a building in the area. The officers were equipped with binoculars and police radios, and they maintained radio contact with other officers constituting arrest teams. Those arrest teams were positioned outside the housing project and were poised to move into the project to effectuate the arrest of suspected drug dealers at the direction of the surveillance team.

Iamartino observed the defendant loitering within the apartment complex, near what appeared to be an abandoned building, and counting money. While the defendant was so engaged, a car entered the lot next to building, and the defendant approached the car and

---

[1] The state has conceded, and we agree, that the defendant's conviction of both possession of narcotics and possession of narcotics with intent to sell violated the defendant's double jeopardy rights.

[2] During the trial, that housing project was referred to, alternately, as "Trumbull Gardens," "Beardsley Gardens" and "Trumbull Gardens, Beardsley Terrace." It is clear from the context in which those designations are used, however, that all of those designations are meant to refer to the same housing project.

talked briefly with the driver. The defendant and the driver then walked to a relatively secluded area between two buildings where the driver handed the defendant some money. In exchange, the defendant gave the driver some small items that he retrieved from his pocket. The driver then returned to her car and departed while the defendant resumed his previous station and returned to counting his money.

A short while later, a second female approached the defendant and pointed out the presence of two nearby police cars. At the sight of an officer, the defendant began to leave the scene. At that point, Iamartino radioed his arrest team, which moved in and arrested the defendant. The arrest team searched the defendant's person and discovered $55 in cash and two small plastic bags containing a white powder that subsequently tested positive for cocaine.

I

We first consider the defendant's claim that the court improperly failed to suppress evidence. The defendant argues that the evidence seized from him at the time of his arrest should have been suppressed because that arrest was made without probable cause. "Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on the issue, therefore, is subject to plenary review on appeal." (Citation omitted.) *State* v. *Clark*, 255 Conn. 268, 279, 764 A.2d 1251 (2001).

"We note at the outset that a search conducted without a warrant issued upon probable cause is per se unreasonable, subject only to a few specifically established and well delineated exceptions. . . . It is the state's burden at trial to establish the exception. . . . If evidence obtained without a warrant was obtained as a result of a valid search and seizure incident to a

lawful arrest, such evidence was not illegally obtained and is admissible." (Citations omitted.) *State* v. *Lizotte*, 11 Conn. App. 11, 17, 525 A.2d 971, cert. denied, 204 Conn. 806, 528 A.2d 1154 (1987). The issue before us, then, is whether the search of the defendant was incident to a lawful, warrantless arrest.

A police officer is authorized to arrest, without a warrant, "any person who the officer has reasonable grounds to believe has committed or is committing a felony." General Statutes § 54-1f (b); *State* v. *Dennis*, 189 Conn. 429, 431, 456 A.2d 333 (1983). The term "reasonable grounds" as used in the statute is synonymous with probable cause. *State* v. *Dennis*, supra, 431.

"[T]o establish probable cause, it is not necessary to produce a quantum of evidence necessary to convict. . . . Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a felony has been committed." (Citations omitted.) *State* v. *Cobuzzi*, 161 Conn. 371, 376, 288 A.2d 439 (1971), cert. denied, 404 U.S. 1017, 92 S. Ct. 677, 30 L. Ed. 2d 664 (1972). "In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar* v. *United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949). "Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false. *Texas* v. *Brown*, 460 U.S. 730, [742] 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983)." *Three S. Development Co.* v. *Santore*, 193 Conn. 174, 175, 474 A.2d 795 (1984).

In reviewing whether the court properly concluded that the search and seizure was valid under the excep-

tion to the warrant requirement for a search incident to a lawful arrest, it is first necessary to evaluate the validity of the arrest. General Statutes § 54-1f (b) authorizes a police officer to make a warrantless arrest based on probable cause.[3] Under the federal and Connecticut constitutions, the court uses a totality of the circumstances test in determining whether probable cause existed. See *Illinois* v. *Gates*, 462 U.S. 213, 231–32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *State* v. *Velasco*, 248 Conn. 183, 191–92, 728 A.2d 493 (1999).

"In reviewing a trial court's determination that probable cause to arrest existed, we consider whether [it is] legally and logically correct and whether [it] find[s] support in the facts set out in the memorandum of decision . . . . Because a trial court's determination of the existence of probable cause implicates a constitutional claim, we must review the record carefully to ensure that its determination [is] supported by substantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Clark*, supra, 255 Conn. 293–94. "In evaluating probable cause for a warrantless search, the court may consider *all* of the legally obtained facts available to a police officer, and *all* of the reasonable inferences that might be drawn therefrom in light of the officer's training and experience." (Emphasis in original; internal quotation marks omitted.) *State* v. *Austin*, 74 Conn. App. 802, 807–808, 813 A.2d 1060, cert. denied, 263 Conn. 910, 821 A.2d 766 (2003).

At the probable cause hearing, Iamartino testified that on the morning of August 19, 1999, he was working as a surveillance officer assigned to Trumbull Gardens.

---

[3] General Statutes § 54-1f (b) provides: "Members of the Division of State Police within the Department of Public Safety or of any local police department or any chief inspector or inspector in the Division of Criminal Justice shall arrest, without previous complaint and warrant, any person who the officer has reasonable grounds to believe has committed or is committing a felony."

Iamartino testified that once an area has been targeted for narcotics surveillance, the surveillance officer's job is to find a location where he can view individuals involved in illegal activities, identify them and call in the identification to the arrest team, which would then apprehend the suspect. Iamartino further testified that while conducting surveillance at the housing complex, he observed the defendant counting cash while standing in front of an abandoned building. While the defendant was counting the money, a Mazda automobile entered the parking lot of the building and parked. The defendant ran to the car and spoke to the driver. The driver exited the vehicle, and the two individuals walked to an area between two buildings where the driver handed the defendant some cash. The defendant then removed some small items from his pocket and handed them to the female driver. Iamartino was unable to make out the color or any distinguishing characteristics of those items, other than that they were small. On the basis of his past experience as a narcotics officer and having been involved in previous surveillances, however, Iamartino believed that the small items that the defendant handed to the female were narcotics.

Once the female began to return to her car, Iamartino radioed the arrest team and provided a description of the female, her car and the direction in which she was traveling.[4] Thereafter, the defendant resumed his position in front of the abandoned building and returned to counting his cash. Shortly after the defendant returned to his station in front of the building, an unidentified female approached him, spoke with him briefly and pointed to where a marked Bridgeport police cruiser and an unmarked police vehicle were parked on the street. Neither of those vehicles was part of Iamartino's surveillance operation.

---

[4] The police, however, were unable to apprehend the driver of the vehicle.

When he saw the police vehicles, the defendant began to walk away from the scene. At that point, Iamartino radioed the arrest team and gave instructions to apprehend the defendant. Iamartino made that call on the basis of his belief that the presence of the police vehicles would discourage the defendant from engaging in any further drug transactions.

Following, Iamartino's testimony, defense counsel argued that Iamartino could not have been located in such an area as to have witnessed everything that he testified about. Because the exact location of Iamartino's concealed surveillance was not disclosed for purposes of police safety, defense counsel argued in the alternative about what could have been observable to Iamartino. Specifically, counsel argued that the officer could have observed either the action on Reservoir Avenue or what took place in the area between the buildings, but not both from a single vantage point.

In its oral decision, the court flatly rejected the defendant's argument, finding that the officer was capable of observing the salient action leading to the defendant's arrest. The court concluded that "taking what I have to take in order to find probable cause for the arrest, I have no reason to disbelieve that the officer saw a white female pull her car into the parking lot . . . . The defendant approached her. They walked off together. He clearly stated he saw the transaction, based on his experience, that he knew to be a drug transaction. . . . I think that this suspicion was confirmed upon the arrest, which was well founded, based on his experience. . . . I believe that there was probable cause for it, and that has been demonstrated by the police officer's testimony, which I find to be credible, if a little sketchy."

We note that the defendant's argument on appeal is different from that raised during the suppression hear-

ing. Rather than arguing that the officer could not have observed all that he claimed to have observed, the defendant now appears to concede that the officer could have observed what he claimed to have seen, but argues that the sum of those observations do not provide a sufficient basis to establish probable cause. Specifically, the defendant argues that probable cause was lacking because the officer could not identify sufficiently the items given by the defendant to establish that they were in fact narcotics. Although the present argument was not raised at the suppression hearing, review is warranted under *State* v. *Evans*, 165 Conn. 61, 327 A.2d 576 (1973), as refined by *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), because the claim is of constitutional magnitude in that it alleges a violation of a fundamental right.[5]

A survey of our case law in the area of probable cause for arrest arising in the context of narcotics surveillance supports the court's conclusion that in the present case, there was probable cause to arrest the defendant.[6] For

[5] Under *State* v. *Golding*, supra, 213 Conn. 239–40, a defendant can prevail on such a claim "only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail."

[6] The defendant relies on three cases for the proposition that when the item exchanged cannot be identified by the observing officer, then, in the absence of other corroborating circumstances, the inference that the item exchanged was an illegal substance is not a reasonable one, but rather rests on speculation and conjecture. See *State* v. *Davis*, 38 Conn. App. 621, 624–28, 662 A.2d 812, cert. denied, 235 Conn. 919, 665 A.2d 907 (1995); *State* v. *Arbelo*, 37 Conn. App. 156, 158–62, 655 A.2d 263 (1995); *State* v. *Mierez*, 24 Conn. App. 543, 551–53, 590 A.2d 469, cert. denied, 219 Conn. 910, 911, 593 A.2d 136 (1991). Each of those cases, however, involved a sufficiency of the evidence claim in which the court was called on to determine whether the evidence was sufficient to establish the defendant's guilt for the crime charged beyond a reasonable doubt. We disagree with the defendant that those cases establish a general rule that a police officer must actually observe

instance, in *State* v. *Austin*, supra, 74 Conn. App. 802, we concluded that probable cause to arrest the defendant existed when the arresting officers, during a surveillance of a known high crime area, observed the defendant waiting on the street, an unknown individual approached him, they engaged in a brief conversation, and the individual gave the defendant some money in return for which he received from the defendant some small bags containing a white substance. Id., 808–809.

In the present case, the officer saw the defendant loitering and counting cash near an apparently abandoned building in a neighborhood targeted for drug surveillance. He saw a car approach, after which the driver and the defendant walked to a secluded area in an apparent effort to cloak the subsequent transaction, and saw the driver hand the defendant some money and the defendant hand her several small items. The driver then departed, and the defendant returned to his station near the abandoned building and resumed counting his money. When the defendant was alerted to the nearby presence of police, he began to depart. On the basis of the foregoing facts, we conclude that the facts and circumstances within the knowledge of the observing officer were sufficient in themselves to warrant a person of reasonable caution to believe a felony had been committed.

## II

The defendant also claims that he was denied his constitutional right to a speedy trial,[7] and that the court improperly denied his motion for a speedy trial and his motion to dismiss on speedy trial grounds. We disagree.

the drugs in question to establish the lesser quantum of probable cause to arrest.

[7] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."

"General Statutes § 54-82m[8] codifies a defendant's constitutional right to a speedy trial and confers on the judges of the Superior Court the authority to make such rules as they deem necessary to establish a procedure for implementing that right. Pursuant to that authority, the judges adopted Practice Book §§ 43-39 through 43-41."[9] *State* v. *Hampton*, 66 Conn. App. 357, 366–67, 784 A.2d 444, cert. denied, 259 Conn. 901, 789 A.2d 992 (2001).

"The determination of whether a defendant has been denied his right to a speedy trial is a finding of fact, which will be reversed on appeal only if it is clearly

[8] General Statutes § 54-82m provides: "In accordance with the provisions of section 51-14, the judges of the Superior Court shall make such rules as they deem necessary to provide a procedure to assure a speedy trial for any person charged with a criminal offense on or after July 1, 1985. Such rules shall provide that (1) in any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of a criminal offense shall commence within twelve months from the filing date of the information or indictment or from the date of the arrest, whichever is later, except that when such defendant is incarcerated in a correctional institution of this state pending such trial and is not subject to the provisions of section 54-82c, the trial of such defendant shall commence within eight months from the filing date of the information or indictment or from the date of arrest, whichever is later; and (2) if a defendant is not brought to trial within the time limit set forth in subdivision (1) and a trial is not commenced within thirty days of a motion for a speedy trial made by the defendant at any time after such time limit has passed, the information or indictment shall be dismissed. Such rules shall include provisions to identify periods of delay caused by the action of the defendant, or the defendant's inability to stand trial, to be excluded in computing the time limits set forth in subdivision (1)."

[9] Practice Book § 43-41 provides: "If the defendant is not brought to trial within the applicable time limit set forth in Sections 43-39 and 43-40, and, absent good cause shown, a trial is not commenced within thirty days of the filing of a motion for speedy trial by the defendant at any time after such time limit has passed, the information shall be dismissed with prejudice, on motion of the defendant filed after the expiration of such thirty day period. For the purpose of this section, good cause consists of any one of the reasons for delay set forth in Section 43-40. When good cause for delay exists, the trial shall commence as soon as is reasonably possible. Failure of the defendant to file a motion to dismiss prior to the commencement of trial shall constitute a waiver of the right to dismissal under these rules."

erroneous. . . . The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts. . . . Although the right to a speedy trial is fundamental, it is necessarily relative, since a requirement of unreasonable speed would have an adverse impact both on the accused and on society." (Internal quotation marks omitted.) *State* v. *Nicholson*, 71 Conn. App. 585, 597, 803 A.2d 391, cert. denied, 261 Conn. 941, 808 A.2d 1134 (2002), quoting *State* v. *Lacks*, 58 Conn. App. 412, 417, 755 A.2d 254, cert. denied, 254 Conn. 919, 759 A.2d 1026 (2000).

The following additional facts are necessary for our resolution of the defendant's claim. The defendant was arrested on August 19, 1999, and was incarcerated pending trial on the basis of his inability to post a surety bond. On May 1, 2000, the incarcerated defendant filed a motion for a speedy trial. The court denied that motion on May 2, 2000.

In response to the defendant's subsequent motion to dismiss on speedy trial grounds, the court prepared a chart outlining the pertinent dates on which action was taken with regard to the defendant's case. The chart also indicated the excludable time periods relative to calculating the time within which the defendant's trial was to commence for the purpose of complying with the speedy trial rules. In that chart, the court noted the following. On August 20, 1999, the public defender representing the defendant requested a continuance of fourteen days. On September 3 and 24, 1999, the public defender requested further continuances of twenty-one and fourteen days, respectively. On October 22, 1999, following an offer from the state to resolve the case, the public defender requested a continuance of seventeen days to discuss that offer with the defendant. The defendant rejected that offer on November 8, 1999, and the case was assigned to the jury list. On December 17, 1999, the public defender requested a continuance of

eighteen days to enable the defendant to discuss with his family another offer from the state. On January 4, 2000, the public defender requested a further continuance of seven days to speak with the prosecutor. Thereafter, the case proceeded to trial on June 27, 2000, without any further excludable time periods intervening. Thus, by the court's reckoning, continuances requested by the defendant resulted in a total delay of ninety-one days, which period should not be included in the calculation for determining compliance with the speedy trial rules.

Practice Book § 43-40 (7) expressly provides for the exclusion of time resulting from a continuance granted by the judicial authority at the personal request of the defendant. The applicable language provides: "The following periods of time shall be excluded in computing the time within which the trial of a defendant charged by information with a criminal offense must commence pursuant to Section 43-39 . . . (7) The period of delay resulting from a continuance granted by the judicial authority at the personal request of the defendant." Practice Book § 43-40. The defendant argues that Practice Book § 43-40 (7) should be construed strictly so as to require that for any continuance to be excluded from the speedy trial calculation, the request for such continuance must be made by the defendant, himself, rather than by a representative of the defendant. We disagree that the language of the rule dictates such a narrow reading.

We note at the outset that Practice Book § 1-8 specifically dictates that the rules of practice are to be interpreted liberally to achieve their intended effect of facilitating the business of the courts and advancing justice.[10] Although in the present case, the requests for

---

[10] Practice Book § 1-8 provides: "The design of these rules being to facilitate business and advance justice, they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice."

continuances were made by defense counsel rather than by the defendant, himself, we find that distinction to be inconsequential. "Absent some indication to the contrary, a court is entitled to rely on counsel's representations on behalf of his or her client." *State* v. *Stewart*, 64 Conn. App. 340, 349–50, 780 A.2d 209, cert. denied, 258 Conn. 909, 782 A.2d 1250 (2001). The analysis in *Stewart* is particularly illuminating with respect to the distinction that the defendant currently advances on appeal. In *Stewart*, we recognized a distinction between matters of trial strategy, for which counsel has ultimate responsibility, and decisions concerning " 'inherently personal rights of fundamental importance to the defendant . . . .' " Id., 353. "It is . . . recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal . . . . However, [o]nce counsel is appointed, the day-to-day conduct of the defense rests with the attorney. He, not the client, has the immediate—and ultimate—responsibility of deciding if and when to object, which witnesses, if any to call, and what defenses to develop. Not only do these decisions rest with the attorney, but such decisions must, as a practical matter, be made without consulting the client." (Citations omitted; internal quotation marks omitted.) Id., 352. We recognized, nevertheless, that even after a defendant has retained counsel, the defendant, rather than counsel, retains the ultimate responsibility and power to exercise certain inherently personal rights. We do not interpret that dichotomy to mean, however, that defense counsel can take no action with respect to those inherently personal rights; only that the ultimate authority for such action rests with the defendant and the defendant can, accordingly, override contrary wishes of his counsel. As with any right, however, the defendant is free to waive his right to a speedy trial if he so chooses.

Prior to the adoption of the specific rule of practice at issue in the present case, our Supreme Court recognized that the question of "[w]hether an accused has been denied his constitutional right to a speedy trial depends upon the facts in a particular case. *The right may be waived when a defendant consents to delay* . . . . *Waiver may be implied where the defendant, in court, interposes no objections to a continuance.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Hodge*, 153 Conn. 564, 569–70, 219 A.2d 367 (1966). "No general principle can be stated in an effort to prescribe an exact period of time to satisfy the constitutional right to a speedy trial. Under the facts of this case, for instance, there were delays occasioned by the defendant and his counsel throughout the proceedings before the trial took place. The constitutional provision does not rule out accidental, necessary or reasonable delays but only those which are vexatious, capricious, arbitrary or oppressive." Id., 570, citing *Pollard* v. *United States*, 352 U.S. 354, 361, 77 S. Ct. 481, 1 L. Ed. 2d 393 (1957).

Here, the delays were occasioned by the defendant's counsel for the defendant's advantage. The defendant took advantage of the numerous continuances requested on his behalf by counsel. The defendant cannot stand by mute while his counsel continues the proceedings on his behalf and then, when the speedy trial clock runs out, claim that counsel did not have the authority to request those continuances. Although mere silence is not enough from which to infer a waiver of a constitutional right, such a waiver may be found in the defendant's course of conduct. See *State* v. *Hodge*, supra, 153 Conn. 569–70.

Absent any intervening, excludable delays, the defendant's trial should have begun on April 20, 2000, eight months from the filing of the information. Taking into consideration the ninety-one days of delay occasioned

by the defendant, however, the defendant's trial need not have commenced until July 19, 2000. The defendant's trial actually began on June 27, 2000. Accordingly, we conclude that the defendant was not deprived of his right to a speedy trial.

## III

The defendant also claims that there was insufficient evidence that he possessed narcotics with the intent to sell. Specifically, the defendant claims that the evidence was insufficient to establish that he possessed the drugs with the intent to sell, rather than merely for personal consumption. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Green*, 261 Conn. 653, 667, 804 A.2d 810 (2002).

We also note that "[w]here there is sufficient evidence to support a reasonable inference that the defendant intended to commit the crime charged, whether such an inference should be drawn is properly a question for the jury to decide." *State* v. *Morrill*, 193 Conn. 602, 609, 478 A.2d 994 (1984).

"It is within the province of the jury to draw reasonable and logical inferences from the facts proven. . . . The jury may draw reasonable inferences based on other inferences drawn from the evidence presented. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . We

note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. . . . It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether *it* believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . In doing so, we keep in mind that [w]e have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility." (Emphasis in original; internal quotation marks omitted.) *State* v. *Barber*, 64 Conn. App. 659, 664–65, 781 A.2d 464, cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001).

"Proof of intent is usually established through circumstantial evidence, from which the jury may draw reasonable and logical inferences. . . . The quantity of narcotics found in the defendant's possession [is] probative of whether the defendant intended to sell the drugs. . . . Also indicative of the defendant's intent to sell narcotics is the manner in which the narcotics are packaged. . . . Evidence demonstrating that the defendant was present in a known drug trafficking area further suggests an intent to sell. . . . In addition, the absence of drug paraphernalia indicates that the substance is not intended for personal use, but rather for

sale to others." (Citations omitted; internal quotation marks omitted.) Id., 667.

A brief recap of the facts in the record is sufficient to establish that there was sufficient evidence to support a finding that the defendant had the intent to sell the drugs found in his possession. At the outset, we note that the defendant does not dispute that he was in possession of illegal drugs. As far as the intent to sell those drugs is concerned, the following facts are relevant to our determination. First, the defendant was observed loitering in an area known for commercial drug activity. The defendant also was observed engaging in what an experienced narcotics officer believed to be a drug transaction. The defendant, rather than offering a nonincriminating explanation for his transaction with the driver of the Mazda, denied the very presence of the car and driver the officers observed in connection with the alleged drug sale. Finally, the drugs were packaged in separate, small plastic bags, and the defendant did not have any drug paraphernalia on his person.

We recognize that any one of those facts, standing alone, might not be sufficient to establish an intent to sell beyond a reasonable doubt. For instance, in those cases in which an intent to sell has been founded on the quantity of drugs found in the defendant's possession, that quantity has generally been much greater than in the present case. See State v. Jefferson, 67 Conn. App. 249, 259–60, 786 A.2d 1189 (2001) (defendant constructively possessed seventy-eight glassine folds of cocaine and sixty-six glassine folds of heroin), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002); State v. Lee, 53 Conn. App. 690, 695–96, 734 A.2d 136 (1999) (defendant constructively possessed 172 bags of narcotics). The quantity of drugs is not, however, the sole dispositive factor. Rather, intent is determined from the cumulative weight of the circumstantial evidence, and

the reasonable and logical inferences derived therefrom. See *State* v. *Jefferson*, supra, 258–59. Thus, we have held that there was sufficient evidence to support a finding of intent to sell narcotics where the defendant was apprehended with a mere 2.2 grams of powder cocaine and $71 in cash. *State* v. *Abreu*, 34 Conn. App. 629, 631, 643 A.2d 871, cert. denied, 230 Conn. 915, 645 A.2d 1019 (1994).

We conclude that in the present case, the evidence was sufficient to permit the fact finder reasonably to find that the defendant possessed the intent to sell the drugs found in his possession.

## IV

The defendant also claims that the evidence was insufficient to prove beyond a reasonable doubt that he was within 1500 feet of a housing project, as defined in § 21a-278a (b). We also disagree with that claim.

Although we find that his claim was unpreserved at trial, the defendant seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. "[A]ny defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. Accordingly, we conclude that no practical reason exists to engage in a *Golding* analysis of a sufficiency of the evidence claim and, thus, review the challenge as we do any other properly preserved claim." (Internal quotation marks omitted.) *State* v. *Pranckus*, 75 Conn. App. 80, 85, 815 A.2d 678, cert. denied, 263 Conn. 905, 819 A.2d 840 (2003).

In reviewing the defendant's sufficiency of the evidence claim, we again apply our two part test. First, we construe the evidence in the light most favorable to sustaining the verdict, and then we determine whether, on all of the facts presented and the inferences

reasonably drawn therefrom, the jury could reasonably have concluded that the evidence established guilt beyond a reasonable doubt. *State* v. *Ward*, 76 Conn. App. 779, 796, 821 A.2d 822, cert. denied, 264 Conn. 918, 826 A.2d 1160 (2003).

The sole evidence regarding whether the apartment complex was a "public housing project" pursuant to § 21a-278a (b) was the testimony of Officer Kenneth Rotunno.[11] On direct examination, the prosecutor asked Rotunno whether Trumbull Gardens was a public housing project. Rotunno responded that it was. The defense did not make any objection, nor did it request an offer of proof as to Rotunno's qualifications to testify that the subject apartment complex was a public housing project. The defense also did not cross-examine Rotunno as to his statement that the apartment complex was a public housing project.

After the state rested its case, the defendant requested a judgment of acquittal with regard to all three of the counts pending against him. The sole basis offered in support of that motion concerned the state's alleged failure to establish any activity of a sale. The defendant argued in relevant part that "given the fact that [Iamartino] could not establish a sale, I do not think there is any indication in any evidence produced by either officer that would allow the jury to infer the intent to sell element necessary for both the [charge of] possession of narcotics with intent to sell as well as the [charge of] possession of narcotics with intent to sell within 1500 feet of a [public housing project]."[12]

---

[11] We note that although Officer Iamartino referred to the area being staked out as the Trumbull Gardens housing project, that reference can easily be construed as a mere colloquialism; he did not testify specifically that the apartment complex was a housing project.

[12] We note that the defendant's actual argument stated that there was no evidence to support an inference of intent to sell within 1500 feet of a school. It is obvious from the context of the statement, however, that the defendant meant to refer to a public housing project rather than a school.

The court denied the motion for a judgment of acquittal, stating that "the jury heard evidence from Officer Iamartino that, based on his experience, what he viewed was a narcotics transaction. He described a transaction and relied on his own experience, and I believe that the jury certainly has the right to infer, based on all of the surrounding circumstances plus his own experience, that a narcotics transaction did in fact take place. They have evidence before them that it took place at a housing project and that, further, that the narcotics were found on the defendant's person."

At the close of evidence, the court properly instructed the jury, inter alia, on the elements that the state was required to prove to support a conviction on the charge of possession of narcotics with intent to sell within 1500 feet of a public housing project. The court instructed the jury: "You must find that the defendant possessed the cocaine with the intent to sell it to another person, and that he did so within 1500 feet of the real property of a public housing project. A public housing project means dwelling accommodations operated as a state or a federally subsidized multifamily housing project by a housing authority, nonprofit corporation or municipal developer. If you find that the state has proven beyond a reasonable doubt the elements of this count, you will find the defendant guilty of this count, and I hope I have made it clear here. If you find the defendant guilty of the first count, possession of cocaine with the intent to sell and you go on to consider the second count, in order for you to find the defendant guilty of the second count, you must find that he not only possessed the cocaine and possessed it with the intent to sell, as alleged in the first count, but that he did so within 1500 feet of a public housing project as I have defined that to you."

Following the court's instruction to the jury, the jury interrupted its deliberations and sent the court a note

with several questions. One of those questions involved the evidence introduced regarding whether the apartment complex was a public housing project. Specifically, the jury asked: "Is there any dispute about whether Trumbull Gardens is a public housing project?" Prior to the jury's being called into the courtroom, defense counsel asked what the court would be stating in reply. The court told defense counsel that it intended to tell the jury that the only evidence with regard to that question came from Officer Rotunno and that the jurors could have that recorded testimony played back if they wanted. Once the jury had been summoned to the courtroom, the court stated with respect to the jury's question, "Ladies and gentlemen, I can't give you a simple yes or no because that's for you to decide. But I can remind you that the only evidence that you heard about whether or not the area was a public housing project came from [the prosecutor's] direct examination of Officer Rotunno. Now, if you recall that, you can answer the question for yourselves. If you don't, we certainly can isolate it and play it back for you, but that was the only evidence that you did hear about that."

In *State* v. *Padua*, 73 Conn. App. 386, 808 A.2d 361 (2002), cert. granted on other grounds, 262 Conn. 941, 815 A.2d 672 (2003), we held that the state's proof was sufficient to establish that the subject apartment complex was a public housing project where the sole evidence to that effect consisted of the statements of the manager of the apartment complex and a police officer that the complex was a public housing project. Id., 409–10. In coming to that conclusion, we noted that the defendant (1) had not cross-examined on the issue of whether the apartment complex was a housing project, (2) did not take an exception to the portion of the jury charge defining the public housing project element of the charged crime and (3) did not request that the court

add to its instruction the definition of a public housing project. Id., 410–12.

We conclude that the facts of *Padua* are sufficiently analogous to the present case to guide our disposition. Here, as in *Padua*, the defendant failed to object to a police officer's testimony that the apartment complex was a public housing project and failed to cross-examine the witness on that issue. Also like the defendant in *Padua*, the defendant here failed to take an exception to any portion of the court's charge to the jury on the issue. In the present case, the defendant also failed to take advantage of a second opportunity to raise an objection with respect to that issue when the jury inquired into that specific issue during its deliberations. Thus, the jury had before it an unchallenged affirmative statement that the apartment complex at issue was a public housing project.

On the basis of the foregoing, we conclude that the jury had sufficient evidence before it to conclude that the transaction occurred within 1500 feet of a public housing project as defined in § 21a-278a (b).

V

The defendant's final claim on appeal is that his rights against double jeopardy were violated when he was convicted and sentenced separately for possession of narcotics and possession of narcotics with intent to sell. We agree.

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . The traditional test for determining whether two offenses are the same offense for double jeopardy purposes was set forth in

*Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Denson*, 67 Conn. App. 803, 808–809, 789 A.2d 1075, cert. denied, 260 Conn. 915, 797 A.2d 514 (2002).

Pursuant to the first prong of the *Blockburger* test, the charged offenses in the state's information arose out of the same act or transaction. In those counts, the state alleged that the crimes were committed at the same time and place: "on or about the 19th day of August, 1999, at approximately 9:50 a.m., in the vicinity of 410 Trumbull Avenue . . . ." The first prong of the *Blockburger* test is, therefore, satisfied. See *State* v. *Porter*, 76 Conn. App. 477, 484–85, 819 A.2d 909, cert. denied, 264 Conn. 910, 826 A.2d 181 (2003).

"Turning to the second prong of the *Blockburger* test, [t]he relevant inquiry then becomes whether each statutory violation requires proof of a fact which the other does not." (Internal quotation marks omitted.) Id., 485. "It is clear . . . that if the two counts stand in the relationship of greater and lesser included offense, then [t]he greater offense is . . . by definition the same for purposes of double jeopardy as any lesser offense included in it. . . . The test for determining whether one violation is a lesser included offense in another violation is whether it is possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser. If it is possible, then the lesser violation is not an included crime. . . . In conducting this inquiry, we

look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Miranda,* 260 Conn. 93, 125, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002).

In the present case, it is clear that it is not possible to commit the greater offense, in the manner described in the information, without having first committed the lesser offense and that the two offenses stand in the relationship of greater and lesser included offense. Specifically, the defendant could not have been guilty of violating § 21a-277 (a), possession of narcotics with intent to sell, without having first committed the crime of possession of narcotics in violation of § 21a-279 (a). Accordingly, we conclude that the conviction of those charges did violate the defendant's right against double jeopardy.

"Having reached the conclusion that the defendant's double jeopardy rights were violated, we must next determine the proper remedy and course of action for the trial court on remand. [T]he remedy in a case such as this is to combine the conviction on the lesser included offense with the conviction on the greater and to vacate the sentence on the lesser included offense." (Internal quotation marks omitted.) *State* v. *Porter,* supra, 76 Conn. App. 486. Accordingly, the defendant's conviction of possession of narcotics must be combined with his conviction of possession of narcotics with intent to sell, and his sentence for possession of narcotics must be vacated.

The judgment is reversed in part and the case is remanded with direction to combine the conviction of possession of narcotics with the conviction of possession of narcotics with intent to sell and to vacate the

sentence on the conviction of possession of narcotics. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

